E-FILED
Monday, 23 January, 2017  04:43:25 PM
Clerk, U.S. District Court, ILCD

IN THE
UNITED STATES DISTRICT COURT
for the
Central District of Illinois

UNITES STATES OF AMERICA    )
                v.    )    Case No:  16-30049
                     )
DONALD DOROSHEFF    )
                     )
          Defendant    )

## NOTICE OF FILING

NOW COMES the Defendant, DONALD DOROSHEFF, by and through his counsel Michael J. Costello, and for his Compliance with the Order of Court to file the Search Warrant and Affidavit issued in this cause hereby complies with said order.

DONALD DOROSHEFF, Defendant

By:  /s Michael J. Costello

Michael J. Costello, Attorney for Defendant

## CERTIFICATE OF SERVICE

       The undersigned does hereby certify that the foregoing document was served on the following by enclosing same in an envelope addressed as shown and by depositing said envelope in Springfield, Illinois on this 23$^h$ day of January, 2017.

Crystal Corea
Assistant United States Attorney
151 Paul Findley Federal Bldg and
United States Courthouse
600 East Monroe Street
Springfield, IL 62701

Gail Noll
Assistant United States Attorney
151 Paul Findley Federal Bldg and
United States Courthouse
600 East Monroe Street
Springfield, IL 62701


       /s Michael J. Costello


Michael J. Costello
Attorney at Law
820 South Second Street
First Floor
Springfield, Illinois 62704
Telephone:  (217) 544-5500
ARDC No.:  522627
Costello.m@sbcglobal.net

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Central District of Illinois

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>In the matter of the search of 424 North Fourth Street,<br>Apartment 1313, Springfield, Illinois 62702 | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 16-MJ- 3016

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Central _____ District of _____ Illinois _____
*(identify the person or describe the property to be searched and give its location)*:
  See Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
  See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before   14 days after issuance
                                                                                                      *(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.          ☐ at any time in the day or night as I find reasonable cause has been
                                                                                 established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Tom Schanzle-Haskins                              .
                                    *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
                                                    ☐until, the facts justifying, the later specific date of _____ .

Date and time issued:  3/1/2016  1:29 p.m.                    _____
                                                                                          *Judge's signature*

City and state:   Springfield, IL.                      Tom Schanzle-Haskins, United States Magistrate Judge
                                                                              *Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| In the matter of the search of 424 North Fourth Street, Apartment 1313, Springfield, Illinois 62702. | Case No. _____<br><br>**Filed Under Seal** |
| --- | --- |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, David Harmon, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.    I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been since November 3, 2002.  I am currently assigned to the Springfield, Illinois, office.

2.    This Affidavit is made in support of an application for a warrant to search 424 North Fourth Street, Apartment 1313, Springfield, Illinois 62702 (hereinafter the "SUBJECT PREMISES"), more particularly described in Attachment A.

3.    The purpose of the search is to seize evidence of violations of 18 U.S.C. § 2252A(a)(2)(A), which is receipt and distribution of child pornography, and 18 U.S.C. § 2252A(a)(5)(B), which is possession of child pornography, located within the SUBJECT PREMISES in the Central

1

District of Illinois. Within the SUBJECT PREMISES to be searched, I seek to seize evidence, fruits, and instrumentalities of the foregoing criminal violations. I request authority to search the entire SUBJECT PREMISES, including the residential dwelling and any computer and computer media located therein where the items specified in Attachment B may be found, and to seize all items listed in Attachment B as contraband and instrumentalities, fruits, and evidence of crime.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## DEFINITIONS

5.     The following definitions apply to this Affidavit and attachments hereto:

   a. "Bulletin Board" means an Internet-based website that is either secured (accessible with a password) or unsecured, and provides members with the ability to view postings by other members and make postings themselves. Postings can contain

2

text messages, still images, video images, or web addresses that direct other members to specific content the poster wishes. Bulletin boards are also referred to as "internet forums" or "message boards." A "post" or "posting" is a single message posted by a user. Users of a bulletin board may post messages in reply to a post. A message "thread," often labeled a "topic," refers to a linked series of posts and reply messages. Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread. Bulletin boards often also provide the ability for members to communicate on a one-to-one basis through "private messages." Private messages are similar to e-mail messages that are sent between two members of a bulletin board. They are accessible only by the user who sent/received such a message, or by the Website Administrator.

b. "Chat" refers to any kind of communication over the Internet that offers a real-time transmission of text messages from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that

3

resembles an oral conversation.  This feature distinguishes

chatting from other text-based online communications such as

Internet forums and email.

c.  "Child Erotica," as used herein, means materials or items that

are sexually arousing to persons having a sexual interest in

minors but that are not, in and of themselves, legally obscene or

that do not necessarily depict minors in sexually explicit

conduct.

d.  "Child Pornography," as used herein, is defined in 18 U.S.C. §

2256(8) as any visual depiction of sexually explicit conduct

where (a) the production of the visual depiction involved the use

of a minor engaged in sexually explicit conduct, (b) the visual

depiction is a digital image, computer image, or computer-

generated image that is, or is indistinguishable from, that of a

minor engaged in sexually explicit conduct, or (c) the visual

depiction has been created, adapted, or modified to appear that

an identifiable minor is engaged in sexually explicit conduct.

e.  "Computer," as used herein, is defined pursuant to 18 U.S.C. §

1030(e)(1) as "an electronic, magnetic, optical, electrochemical,

4

or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

f.   "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users. A web server, for example, is a computer which hosts the data associated with a website. That web server receives requests from a user and delivers information from the server to the user's computer via the Internet. A domain name system ("DNS") server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser. Essentially, the domain name must be translated into an Internet Protocol ("IP") address so the computer hosting the web site may be located, and the DNS server provides this function.

g.   "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or

5

00286

35

similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h.  "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

i.  "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which

6

36

explains or illustrates how to configure or use computer hardware, computer software, or other related items.

j. "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

k. "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host

7

to another over a computer network, such as the Internet.  FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

l.  "Host Name." A Host Name is a name assigned to a device connected to a computer network that is used to identify the device in various forms of electronic communication, such as communications over the Internet;

m. "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

n.  The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

o.  "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide

8

00289

a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

p.  "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP

00290

39

addresses can be "dynamic," meaning that the ISP assigns a
different unique number to a computer every time it accesses
the Internet.  IP addresses might also be "static," if an ISP
assigns a user's computer a particular IP address which is used
each time the computer accesses the Internet.  IP addresses
are also used by computer servers, including web servers, to
communicate with other computers.

q. Media Access Control ("MAC") address.  The equipment that
connects a computer to a network is commonly referred to as a
network adapter.  Most network adapters have a MAC address
assigned by the manufacturer of the adapter that is designed to
be a unique identifying number. A unique MAC address allows
for proper routing of communications on a network.  Because
the MAC address does not change and is intended to be
unique, a MAC address can allow law enforcement to identify
whether communications sent or received at different times are
associated with the same adapter.

r. "Minor" means any person under the age of eighteen years.
See 18 U.S.C. § 2256(1).

10

00291    40

s.  The terms "records," "documents," and "materials," as used
herein, include all information recorded in any form, visual or
aural, and by any means, whether in handmade form (including,
but not limited to, writings, drawings, painting), photographic
form (including, but not limited to, microfilm, microfiche, prints,
slides, negatives, videotapes, motion pictures, photocopies),
mechanical form (including, but not limited to, phonograph
records, printing, typing) or electrical, electronic or magnetic
form (including, but not limited to, tape recordings, cassettes,
compact discs, electronic or magnetic storage devices such as
floppy diskettes, hard disks, CD-ROMs, digital video disks
("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media
Cards ("MMCs"), memory sticks, optical disks, printer buffers,
smart cards, memory calculators, electronic dialers, or
electronic notebooks, as well as digital data files and printouts
or readouts from any magnetic, electrical or electronic storage
device).

t.  "Secure Shell" ("SSH"), as used herein, is a security protocol for
logging into a remote server.  SSH provides an encrypted

11

41

session for transferring files and executing server programs.

u. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.  See 18 U.S.C. § 2256(2).

v. "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address.   URLs are made of letters, numbers, and other symbols in a standard form.   People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

w. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

x. "Website" consists of textual pages of information and

12

00293

42

associated graphic images.  The textual information is stored in

a specific format known as Hyper-Text Mark-up Language

("HTML") and is transmitted from web servers to various web

clients via Hyper-Text Transport Protocol ("HTTP").

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

6.     Donald Henry Dorosheff or a user of the Internet account at the

SUBJECT PREMISES has been linked to an online community of

individuals who regularly send and receive child pornography via a website

that operated on an anonymous online network.  The website is described

below and referred to herein as "Website A."  There is probable cause to

believe that Donald Dorosheff or a user of the Internet account at the

SUBJECT PREMISES knowingly accessed with intent to view, receive, and

distribute child pornography on "Website A."

7.     The actual name of "Website A" is known to law enforcement.

Disclosure of the name of the site would potentially alert its members to the

fact that law enforcement action is being taken against the site and its

users, potentially provoking members to notify other members of law

enforcement action, flee, and/or destroy evidence.  Accordingly, for

purposes of the confidentiality and integrity of the ongoing investigation

13

43

involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified as "Website A."

## The Network

8.    "Website A" operated on a network ("the Network") available to Internet users who are aware of its existence. The actual name of the Network is known to law enforcement. Disclosure of the name of the network would potentially alert its members to the fact that law enforcement action is being taken against the network, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence. Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the network will be identified as the Network.

9.    The Network is designed specifically to facilitate anonymous communication over the Internet. In order to access the Network, a user must install computer software that is publicly available, either by downloading software to the user's existing web browser, downloading free software available from the Network's administrators, or downloading a

14

publicly-available third-party application. Users may also access the Network through so-called "gateways" on the open Internet, however, use of those gateways does not provide users with the full anonymizing benefits of the Network.

10.    Using the Network prevents someone attempting to monitor an Internet connection from learning what sites a user visits and prevents the sites the user visits from learning the user's physical location. Because of the way the Network routes communication through other computers, traditional IP identification techniques are not viable.

11.    Websites that are accessible only to users within the Network can be set up within the Network and "Website A" was one such website. Accordingly, "Website A" could not generally be accessed through the traditional Internet. Only a user who had installed the appropriate software on the user's computer could access "Website A." Even after connecting to the Network, however, a user had to know the exact web address of "Website A" in order to access it.

12.    Due to a misconfiguration, prior to February 20, 2015, "Website A" was occasionally accessible through the traditional Internet. In order to access "Website A" in that manner, however, a user would have had to

15

know the exact IP address of the computer server that hosted "Website A", which information was not publicly available. As of on or about February 20, 2015, "Website A" was no longer accessible through the traditional Internet.

13.    Websites on the Network are not indexed in the same way as websites on the traditional Internet. Accordingly, unlike on the traditional Internet, a user could not simply perform a Google search for the name of "Website A," obtain the web address for "Website A," and click on a link to navigate to "Website A." Rather, a user had to have obtained the web address for "Website A" directly from another source, such as other users of "Website A," or from online postings describing both the sort of content available on "Website A" and its location. Accessing "Website A" therefore required numerous affirmative steps by the user, making it extremely unlikely that any user could have simply stumbled upon "Website A" without first understanding its content and knowing that its primary purpose was to advertise and distribute child pornography.

14.    The Network's software protects users' privacy online by bouncing their communications around a distributed network of relay

16

computers run by volunteers all around the world, thereby masking the user's actual IP address which could otherwise be used to identify a user.

15.    The Network also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, or an instant messaging server.  Within the Network itself, entire websites can be set up which operate the same as regular public websites with one critical exception - the IP address for the web server is hidden and instead is replaced with a Network-based web address.  A user can only reach such sites if the user is using the Network client and operating in the Network.  Because neither a user nor law enforcement can identify the actual IP address of the web server, it is not possible to determine through public lookups where the computer that hosts the website is located.  Accordingly, it is not possible to obtain data detailing the activities of the users from the website server through public lookups.

<u>Description of "Website A" and its Content</u>

16.    "Website A" was a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children,

17

including the safety and security of individuals who seek to sexually exploit children online. On or about February 20, 2015, the computer server hosting "Website A" was seized from a web-hosting facility in Lenoir, North Carolina. The website operated in Newington, Virginia, from February 20, 2015, until March 4, 2015, at which time "Website A" ceased to operate. Between February 20, 2015, and March 4, 2015, law enforcement agents acting pursuant to an order of the United States District Court for the Eastern District of Virginia monitored electronic communications of users of "Website A." Before, during, and after its seizure by law enforcement, law enforcement agents viewed, examined and documented the contents of "Website A," which are described below.

17.    According to statistics posted on the site, "Website A" contained a total of 117,773 posts, 10,622 total topics, and 214,898 total members as of March 4, 2015. The website appeared to have been operating since approximately August 2014, which is when the first post was made on the message board. On the main page of the site, located to either side of the site name were two images depicting partially clothed prepubescent girls with their legs spread apart, along with the text underneath stating, "No cross-board reposts, .7z preferred, encrypt filenames, include preview,

18

Peace out." Based on my training and experience, I know that: "no cross-board reposts" refers to a prohibition against material that is posted on other websites from being "re-posted" to "Website A;" and ".7z" refers to a preferred method of compressing large files or sets of files for distribution. Two data-entry fields with a corresponding "Login" button were located to the right of the site name. Located below the aforementioned items was the message, "Warning! Only registered members are allowed to access the section. Please login below or 'register an account' [(a hyperlink to the registration page)] with "[Website A]." Below this message was the "Login" section, consisting of four data-entry fields with the corresponding text, "Username, Password, Minutes to stay logged in, and always stay logged in."

18.    Upon accessing the "register an account" hyperlink, there was a message that informed users that the forum required new users to enter an email address that looks to be valid. However, the message instructed members not to enter a real email address. The message further stated that once a user registered (by selecting a user name and password), the user would be able to fill out a detailed profile. The message went on to warn the user "[F]or your security you should not post information here that

19

can be used to identify you." The message further detailed rules for the forum and provided other recommendations on how to hide the user's identity for the user's own security.

19.    After accepting the above terms, registration to the message board then required a user to enter a username, password, and e-mail account; although a valid e-mail account was not required as described above.

20.    After successfully registering and logging into the site, the user could access any number of sections, forums, and sub-forums. Some of the sections, forums, and sub-forums available to users included: (a) How to; (b) General Discussion; (c) [Website A] information and rules; and (d) Security & Technology discussion. Additional sections, forums, and sub-forums included (a) Jailbait – Boy;  (b) Jailbait – Girl; (c) Preteen – Boy; (d) Preteen – Girl; (e) Pre-teen Videos – Girl HC; (f) Pre-teen Videos – Boys HC; (g) Toddlers; and (h) Kinky Fetish – Scat.  Based on my training and experience, I know that "jailbait" refers to underage but post-pubescent minors; the abbreviation "HC" means hardcore (i.e., depictions of penetrative sexually explicit conduct); and "scat" refers to the use of feces in various sexual acts, watching someone defecating, or simply seeing the

20

feces.   An additional section and forum was also listed in which members could exchange usernames on a Network-based instant messaging service that I know, based upon my training and experience, to be commonly used by subjects engaged in the online sexual exploitation of children.

21.    A review of the various topics within the above forums revealed each topic contained a title, the author, the number of replies, the number of views, and the last post.  The "last post" section of a particular topic included the date and time of the most recent posting to that thread as well as the author.  Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included in the post thread below it.  Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

22.    A review of the various topics within the "[Website A] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums revealed that the majority contained general

21

00302

51

information in regards to the site, instructions and rules for how to post, and welcome messages between users.

23.   A review of topics within the remaining forums revealed the majority contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers.  Examples of these are as follows:

    a. On February 3, 2015, a user posted a topic entitled "Buratino-06" in the forum "Pre-teen – Videos - Girls HC" that contained numerous images depicting child pornography of a prepubescent or early pubescent girl.  One of these images depicted the girl being orally penetrated by the penis of a naked male;

    b. On January 30, 2015, a user posted a topic entitled "Sammy" in the forum "Pre-teen – Photos – Girls" that contained hundreds of images depicting child pornography of a prepubescent girl. One of these images depicted the female being orally penetrated by the penis of a male; and

    c. On September 16, 2014, a user posted a topic entitled "9yo Niece - Horse.mpg" in the "Pre-teen Videos - Girls HC" forum

00303

52

that contained four images depicting child pornography of a
prepubescent girl and a hyperlink to an external website that
contained a video file depicting what appeared to be the same
prepubescent girl. Among other things, the video depicted the
prepubescent female, who was naked from the waist down with
her vagina and anus exposed, lying or sitting on top of a naked
adult male, whose penis was penetrating her anus.

24.    A list of members, which was accessible after registering for an
account, revealed that approximately 100 users made at least 100 posts to
one or more of the forums. Approximately 31 of these users made at least
300 posts. In total, "Website A" contained thousands of postings and
messages containing child pornography images. Those images included
depictions of nude prepubescent minors lasciviously exposing their genitals
or engaged in sexually explicit conduct with adults or other children.

25.    "Website A" also included a feature referred to as "[Website A]
Image Hosting." This feature of "Website A" allowed users of "Website A"
to upload links to images of child pornography that are accessible to all
registered users of "Website A." On February 12, 2015, an FBI Agent
accessed a post on "Website A" titled "Giselita" which was created by a

23

particular "Website A" user.  The post contained links to images stored on "[Website A] Image Hosting."  The images depicted a prepubescent girl in various states of undress.  Some images were focused on the nude genitals of a prepubescent girl.  Some images depicted an adult male's penis partially penetrating the vagina of a prepubescent girl.

26.    Text sections of "Website A" provided forums for discussion of methods and tactics to use to perpetrate child sexual abuse.

a. On January 8, 2015, a user posted a topic entitled "should i proceed?" in the forum "Stories - Non-Fiction" that contained a detailed accounting of an alleged encounter between the user and a 5 year old girl. The user wrote "...it felt amazing feeling her hand touch my dick even if it was through blankets and my pajama bottoms..."  The user ended his post with the question, "should I try to proceed?" and further stated that the girl "seemed really interested and was smiling a lot when she felt my cock."  A different user replied to the post and stated, "...let her see the bulge or even let her feel you up...you don't know how she might react, at this stage it has to be very playful..."

Court Authorized Use of Network Investigative Technique

24

00305

54

27.    Websites generally have Internet Protocol ("IP") address logs that can be used to locate and identify the site's users.  In such cases, after the seizure of a website whose users were engaging in unlawful activity, law enforcement could  review those logs in order to determine the IP addresses used by users of "Website A" to access the site.  A publicly available lookup could then be performed to determine what Internet Service Provider ("ISP") owned the target IP address.  A subpoena could then be sent to that ISP to determine the user to which the IP address was assigned at a given date and time.

28.    However, because of the Network software utilized by "Website A," any such logs of user activity would contain only the IP addresses of the last computer through which the communications of "Website A" users were routed before the communications reached their destinations. The last computer is not the actual user who sent the communication or request for information, and it is not possible to trace such communications back through the Network to that actual user.  Such IP address logs therefore could not be used to locate and identify users of "Website A."

29.    Accordingly, on February 20, 2015, the same date "Website A" was seized, the United States District Court for the Eastern District of

25

00306

55

Virginia authorized a search warrant to allow law enforcement agents to deploy a Network Investigative Technique ("NIT") on "Website A" in an attempt to identify the actual IP addresses and other identifying information of computers used to access "Website A."  Pursuant to that authorization, between February 20, 2015, and approximately March 4, 2015, each time any user or administrator logged into "Website A" by entering a username and password, the FBI was authorized to deploy the NIT which would send one or more communications to the user's computer. Those communications were designed to cause the receiving computer to deliver to a computer known to or controlled by the government data that would help identify the computer, its location, other information about the computer, and the user of the computer accessing "Website A." That data included:  the computer's actual IP address, and the date and time that the NIT determined what that IP address was; a unique identifier generated by the NIT (e.g., a series of numbers, letters, and/or special characters) to distinguish the data from that of other computers; the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x 86); information about whether the NIT had already been delivered to the computer; the computer's Host

26

56

Name; the computer's active operating system username; and the computer's MAC address.

## Grite On "Website A"

30.    According to data obtained from logs on "Website A," monitoring by law enforcement, and the deployment of a NIT, a user with the user name "Grite" engaged in the following activity on "Website A."

31.    The profile page of user "Grite" indicated this user originally registered an account on "Website A" on March 3, 2015.  Profile information on "Website A" may include contact information and other information that is supplied by the user.  It also contains information about that user's participation on the site, including statistical information about the user's posts to the site and a categorization of those posts.  According to the user "Grite's" profile, this user was a "newbie" Member of "Website A."  Further, according to the Statistics section of this user's profile, the user "Grite" had been actively logged into the website for a total of 1 hour, 54 minutes and 22 seconds between the dates of March 3, 2015 and March 5, 2015.

## IP Address and Identification of User "Grite" on "Website A"

32.    According to data obtained from logs on "Website A," monitoring by law enforcement, and the deployment of a NIT, on March 4,

00308

57

2015, the user "Grite" engaged in the following activity on "Website A" from

IP address 162.237.221.12 (MAC Address: 6036DDBE079E). During the

session described below, this user browsed "Website A" after logging into

"Website A" with a username and a password.

33.    On March 4, 2015, the user "Grite" with IP address

162.237.221.12 accessed the post entitled "A Family Affair Pt 1 - 3" in the

forum Potpourri >> Family Play Pen. Among other things, this post

contained a post made by a user "Petman" who was listed as a Full

Member on the site. "Petman" appeared to have posted three videos with

thumbnail images, two of which depicted an adult male and an adult female

removing their clothing and engaging in sexual intercourse with a

prepubescent male and a prepubescent female who also had their clothing

removed.

34.    During the following additional sessions, the user "Grite" also

browsed "Website A" after logging into "Website A" with a username and

password.  During these sessions, the user's IP address information was

not collected.

35.    On March 4, 2015, the user "Grite" accessed a post entitled

"Insertions, objects and fun with toys!" (Thread ID "19857") that contained a

28

link to multiple images that depicted several prepubescent females, along with toddlers, who were inserting or had various objects and items inserted into their vaginas.

36.    On March 4, 2015, the user "Grite" accessed a post entitled "One more baby suck cock" (Thread ID "10708") that contained a link which depicted an adult male attempting to insert an erect penis into the mouth of an infant.

37.    Using publicly available websites, FBI Special Agents were able to determine that the above IP Address was operated by the Internet Service Provider ("ISP") AT&T U-Verse.

38.    In March 2015, an administrative subpoena/summons was served to AT&T U-Verse requesting information related to the user who was assigned to the above IP address.  According to the information received from AT&T U-Verse, Donald Henry Dorosheff is receiving Internet service at the address of the SUBJECT PREMISES with an installation date of December 7, 2012.  Internet service was current as of March 4, 2015 at the aforementioned premises.

39.    Among the information collected by the NIT when it was deployed against "Grite" was the hostname "WINDOWS-J25AEVG" and the

29

logon name "Donald", which matches the first name of Donald Dorosheff at the SUBJECT PREMISES.

40.    On February 26, 2016, I spoke with the property manager of the apartment complex in which the SUBJECT PREMISES is located and learned that Donald Dorosheff is currently residing at the SUBJECT PREMISES and has lived alone for about three years at that same location.

41.    On February 26, 2016, I contacted a Sangamon County Sheriff's Office Deputy/Detective and learned that there have been several contacts with Donald Dorosheff.  The most recent contact was Dorosheff's complaint to the Springfield Police Department (SPD) that his car had been burglarized on June 24, 2015, when it was parked in the parking lot of the apartment complex in which the SUBJECT PREMISES is located. Dorosheff's address is listed on the SPD report as 424 North Fourth Street in Springfield, but the apartment number is omitted.  In a different SPD report, Dorosheff was listed as a "person with knowledge" in a complaint of "sexual offenses" that allegedly occurred on March 17, 2015, in the apartment complex in which the SUBJECT PREMISES is located.  This report, dated March 20, 2015, documented a brief interview of Dorosheff,

30

who was not described as a suspect, and listed his address as 424 North

Fourth Street, 1313, which is the SUBJECT PREMISES.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

42.   Based on my previous investigative experience related to child

pornography investigations, and the training and experience of other law

enforcement officers with whom I have had discussions, I know there are

certain characteristics common to individuals who utilize web based bulletin

boards to access with intent to view images of child pornography.

43.   Individuals who access with intent to view child pornography

may receive sexual gratification, stimulation, and satisfaction from contact

with children; or from fantasies they may have viewing children engaged in

sexual activity or in sexually suggestive poses, such as in person, in

photographs, or other visual media; or from literature describing such

activity.

44.   Individuals who access with intent to view child pornography

may collect sexually explicit or suggestive materials, in a variety of media,

including photographs, magazines, motion pictures, videotapes, books,

slides and/or drawings or other visual media.  Individuals who have a

31

sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

45.    Individuals who access with intent to view child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years. These individuals tend to retain these materials because of the great personal value the images have for sexual gratification, the difficulty in obtaining the images as a result of their illegality, and their value to other collectors such that the images may be traded for new images.

32

46.    Likewise, individuals who access with intent to view pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

47.    Individuals who would have knowledge about how to access a hidden and embedded bulletin board would have gained knowledge of its location through online communication with others of similar interest.  Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images.  Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

48.    Individuals who access with intent to view child pornography prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

49.    Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true because of the following two reasons:

a. Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information.  Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names.  This requires searching authorities to examine all the stored data that is available in order to determine whether it is included in the warrant that authorizes the search.  This sorting process can take days or weeks, depending on the volume of data stored, and is generally difficult to accomplish on-site.

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled

34

environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

50.    In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any

35

applications software which may have been used to create the data (whether stored on hard drives or on external media).

51.    Furthermore, because there is probable cause to believe that the computer and its storage devices are all instrumentalities of crimes, within the meaning of 18 U.S.C. §§ 2251 through 2256, they should all be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED REGARDING ELECTRONIC DATA

52.    The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

    a. on-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

36

00317

b. on-site forensic imaging of any computers that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for examination; such imaging may require several hours to complete and require law enforcement agents to secure the search scene until that imaging can be completed;

c. examination of all of the data contained in such computer hardware, computer software, or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

d. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

37

e. surveying various file directories and the individual files they contain;

f. opening files in order to determine their contents;

g. scanning storage areas;

h. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and

i. performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## Conclusion

53.    Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the SUBJECT PREMISES, described in Attachment A. I respectfully request that this Court issue a search warrant for the SUBJECT

38

PREMISES, authorizing the seizure and search of the items described in Attachment B.

54.    Your Affiant is aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process. For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

<u>**REQUEST FOR SEALING**</u>

55.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

*David Harmon*

Special Agent David Harmon
Federal Bureau of Investigation

39

00320    69

Sworn to before me on March ___1___, 2016

Thomas P. Schanzle-Haskins
United States Magistrate Judge

40

00321

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

The location known as 424 North Fourth Street, Apartment 1313, Springfield, IL 62702-5269 is identified as follows:  A one bedroom apartment located on the 13th floor of Sangamon Towers Retirement Living Community, located in downtown Springfield.  The premises to be searched include storage units associated with the apartment.

## PICTURE AND FLOOR PLAN



41



# 1 Bedroom Floor Plan



Living Room
22'8" x 11'6"

Dining Room

Closet

Bed Room
12'6" x 11'

Closet

Bath

Kitchen

42

00323

## ATTACHMENT B

### Information to be Seized

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Section 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

43

00324

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

44

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography and child erotica.

5. Records, information, and items relating to violations of the statutes described above including

    a. Records, information, and items relating to the occupancy or ownership of 424 North 4th Street, Apartment 1313, Springfield, IL 62702-5269 including utility and telephone bills, mail envelopes, or addressed correspondence; Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

    b. Records and information relating to the identity or location of the persons suspected of violating the statutes described above; and

    c. Records and information relating to sexual exploitation of children, including correspondence and communications between users of Website A.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical,

electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

46

00327

## ATTACHMENT A

### DESCRIPTION OF LOCATION TO BE SEARCHED

The location known as 424 North Fourth Street, Apartment 1313, Springfield, IL 62702-5269 is identified as follows:  A one bedroom apartment located on the 13th floor of Sangamon Towers Retirement Living Community, located in downtown Springfiled.  The premises to be searched include storage units associated with the apartment.

### PICTURE AND FLOOR PLAN



40

00329

# 1 Bedroom Floor Plan



00330

## ATTACHMENT B

### Information to be Seized

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Section 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

42

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.  contextual information necessary to understand the evidence described in this attachment.

43

00332

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography and child erotica.

5. Records, information, and items relating to violations of the statutes described above including

   a. Records, information, and items relating to the occupancy or ownership of 424 North 4th Street, Apartment 1313, Springfield, IL 62702-5269 including utility and telephone bills, mail envelopes, or addressed correspondence; Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

   b. Records and information relating to the identity or location of the persons suspected of violating the statutes described above; and

   c. Records and information relating to sexual exploitation of children, including correspondence and communications between users of Website A.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical,

44

electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

45

00334